[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 571 
OPINION
This is an appeal by the State Controller from an order fixing the amount of an inheritance tax. The single question to be decided is whether the value of certain shares of common stock, transferred in trust by the decedent in 1958, should be included in the measure of the tax under section 13643 of the Revenue and Taxation Code.[1] The inheritance tax appraiser included the value of the stock in his computation of the tax. The executor filed objections, and a hearing was held in the superior court, where evidence was received, after which that court made its findings of fact and an order sustaining the objections in this respect and fixing the tax without reference to that transfer. We have concluded that the evidence establishes as a matter of law that the transfer of the common stock is taxable. Accordingly, we reverse the order of the superior court.
Prior to 1958 the decedent, Ada Thatcher Huntzinger, was the owner of a parcel of real property on which she operated an office building known as the Thatcher Medical Center. In 1958, on the advice of her attorney, she adopted an estate plan which contained the following elements:
(1) A corporation was to be formed to own and operate the medical *Page 572 
center. The corporation would issue to Mrs. Huntzinger preferred shares with voting powers of a value equal to the current appraisal of the real property. A nominal amount of common stock was to be issued to her for cash.
(2) The common stock would be transferred irrevocably in trust for the benefit of her three daughters and their children.
(3) Her will would leave the bulk of her estate, including the preferred shares, in trust for her three daughters and their children.
As the plan was explained to Mrs. Huntzinger by her attorney, "your two principal objectives will be to save taxes and to preserve for as long as practical the Medical Center as a unit for the benefit of the family."
Huntzinger Investment Corp. was organized as a California corporation in July 1958. It issued to Mrs. Huntzinger 12,600 shares of its preferred stock, of a par value of $100 per share, in exchange for the real property which had been appraised at a value of $1,260,000. The corporation also issued to her 100 shares of its common stock in exchange for $10,000 of other assets. The preferred shares were entitled to preferential but noncumulative dividends, when and as declared by the directors, at an annual rate not exceeding 5 percent of the par value. In the event of redemption of the preferred shares or the dissolution of the corporation the holders of the preferred shares were entitled to $100 per share plus the amount of any previously declared but unpaid dividends. The common shares could not receive any dividends in any fiscal year unless dividends were first declared and paid upon the preferred shares in that year.
In October 1958 a declaration of trust was executed under which Security First National Bank (now named Security Pacific National Bank) was trustee and Mrs. Huntzinger was trustor. The sole asset of the trust was the 100 shares of common stock which she conveyed to the trustee.
The declaration of trust required the trustee to divide the trust estate into three equal shares, one for each of the three daughters of Mrs. Huntzinger. During the lifetimes of the daughters, respectively, the trustee had discretion to pay so much of the principal or income of the daughter's share to the daughter or any or all of her issue as the trustee deemed to be in the best interests of the daughter or her issue. Notwithstanding this provision, the trustee was directed to "distribute so much of the principal of a daughter's share, up to the whole thereof, to or for the benefit of any or all of her issue to the extent and in accordance with the written direction from time to time of such daughter during her lifetime to the Trustee." *Page 573 
No daughter had the right, however, to direct a distribution which would have the effect of favoring herself, or her estate or creditors.
The daughters each received a testamentary power to appoint any remainder of their trusts to their husbands or issue. If the power of appointment was not exercised the daughter's share was to be subdivided for her issue. As to such issue the trustee was given discretion to distribute income or principal and each issue had the right to withdraw certain amounts from and after the age of 25. Each grandchild was likewise given a testamentary power of appointment. The final termination date of the trust as a whole is 21 years after the death of the last survivor of Mrs. Huntzinger's issue living at the date of the declaration of trust.
The declaration of trust referred to the Thatcher Medical Center as the principal asset of the corporation and to the fact that the stock of the corporation was an asset of the trust. The trustor expressed her wish and desire that the property and any adjacent property subsequently purchased by the corporation and operated as part of the medical center be held intact for the benefit of the members of her family for so long as economically practical.
The trust expressly provided that the trustor had no right or power to alter, amend, revoke or terminate it. The trustee was given broad powers including the power to sell and to reinvest. The trustee was expressly relieved from any responsibility or liability for retaining as a trust asset the stock of the corporation. The trustee was precluded from making any loans to Mrs. Huntzinger without full and adequate security and at current rates of interest. She was precluded from dealing in any manner with the corpus of the trust or its income for less than adequate consideration in money or money's worth.
Throughout the life of Mrs. Huntzinger after creation of the trust, no income was received by the trust and no additional corpus was transferred to it. Mrs. Huntzinger was the only shareholder ever to vote in corporate elections during her life. No dividends were ever declared or paid by the corporation on either the preferred or common stock. The corporation was a successful venture, with profits being used to purchase adjoining property and to expand the medical center.
The inheritance tax appraiser valued the 12,600 shares of preferred stock at $1,260,000. No objection is made, of course, to the inclusion of the value of these shares in the computation of inheritance tax since they were owned by Mrs. Huntzinger at the time of her death.
The appraiser also included in his report, under the heading "Transfers *Page 574 
in Trust" the value of the common stock, which he appraised at $415,000. After reducing this sum by the amount of $415, representing the appraiser's fee, the remainder of $414,585 was allocated one-third ($138,195) to each of the three daughters. The trial court sustained the executor's objections to the inclusion of this property in the computation of the tax.
(1) Preliminarily, we note that the superior court received in evidence, over the executor's objections, certain records of the trustee and records of the corporation offered by the Controller as evidence of Mrs. Huntzinger's intention. The point of the objection was that extrinsic evidence was not admissible to show that a written instrument was intended to have a meaning to which its language was not reasonably susceptible, citingEstate of Cohen (1971) 4 Cal.3d 41, 54 [92 Cal.Rptr. 684,480 P.2d 300].)
No such problem exists here. The records received in evidence show a course of conduct by the trustee and by Mrs. Huntzinger and by the corporation controlled by her which is fully consistent with an intention manifested by the declaration of trust which the court was required to construe. In construing the trust for tax purposes it is necessary and proper to consider contemporaneous circumstances. (See Estate of Rath (1937)10 Cal.2d 399, 404 [75 P.2d 509, 115 A.L.R. 836].) These include the capital structure of the corporation and the other terms of her estate plan, which were to result in the eventual devolution of the entire ownership of the medical center to her lineal descendants.[2] It is also proper to consider the subsequent conduct of the decedent, and manner in which the transferred property was administered with her apparent acquiescence and cooperation, as evidence of the decedent's intent. (See Estateof Madison (1945) 26 Cal.2d 453, 462 [159 P.2d 630].) The evidence received for this purpose did not contradict the terms of the 1958 declaration of trust, but tended to confirm an intent consistent with the terms of the instrument.
The principles governing the application of section 13643 of the Revenue and Taxation Code have been set forth by the Supreme Court in two leading cases: "The inheritance tax is primarily a tax upon the succession to property at death. The statute expressly includes as subjects of inheritance taxation transfers of property by will, succession, or survivorship, and transfers of the proceeds of life insurance. An inheritance tax limited *Page 575 
to the taxation of transfers from the dead to the living, however, could be easily avoided. . . . Revenue and Taxation Code, sections 13641-13648, accordingly provide for the taxation of specified inter vivos transfers by which the owner of property retains such an interest therein or imposes such restrictions upon the use thereof that for tax purposes he is regarded as the owner of the property at his death and his transfer thereof as a testamentary disposition. `The statute taxes not merely those interests which are deemed to pass at death according to refined technicalities of the law of property. It also taxes inter vivos transfers that are too much akin to testamentary dispositions not to be subjected to the same excise.' [Citations omitted.] The tax is imposed on the intervivos transfer but its collection is postponed until the death of the transferor, and it is measured by the market value of the transferred property at the date of his death. . . .
". . . The tax is not imposed on transfers not in contemplation of death to transferees whose interest in and possession or enjoyment of the property are not affected by whether the transferor lives or dies." (Estate of Thurston (1950) 36 Cal.2d 207, 209-211 [223 P.2d 12].)
In the earlier case of Estate of Madison, supra, 26 Cal.2d 453, 463, the court said: "The purpose of the Legislature in imposing a tax on transfers intended to take effect at or after death is to prevent avoidance of the inheritance tax. `The sole reason for mentioning dispositions inter vivos . . . is to prevent the evasion of the tax . . . by such dispositions. In contemplation of that law [the inheritance tax law], the giftsinter vivos therein mentioned are all presumed to have been made with the intent to evade the tax imposed on transfers taking effect by succession at death.' [Citation omitted.] Section 2 (3)(b)[3] does not impose a tax upon certain precisely defined transfers; it is rather an attempt to impose a tax in all cases, regardless of the form of transfer adopted, in which possession or enjoyment does not take effect until the donor's death."
It is not helpful to compare the form of the transfer used in this case with the forms used in Thurston, Madison, and other decided cases, because the forms used in each case are quite different. Rather it is necessary to examine the substance and effect of the transfer in order to classify it under the principles set forth in the law.
(2) The trust which Mrs. Huntzinger created in 1958 became a receptacle into which she could, and actually did, deposit all of the economic gains and profits of the Thatcher Medical Center for the remainder of *Page 576 
her lifetime; and this receptacle was to remain locked until she yielded the key by the transfer of the controlling preferred stock upon her death. Since the articles of incorporation limited the preferred stockholder's share to a return of the initial investment upon liquidation, plus a dividend not exceeding 5 percent per year, all increase in the value of the corporate assets, whether from successful operation of the business, growth of property values, or general inflation, would accrue to the holder of the common stock and not to Mrs. Huntzinger. By failing to declare any preferred dividend, she relinquished to the common shareholder even that modest return on her investment. Since the dividend preference was not cumulative, the passing of a dividend in any year became, to that extent, an irrevocable surrender of earnings in favor of the common shareholder. During the 10-year period from the creation of the corporation and the trust, until her death in 1968, Mrs. Huntzinger devoted her entire capital investment in the Thatcher Medical Center to the eventual enrichment of her daughters and grandchildren who were the beneficiaries of the common stock under the trust and the beneficiaries of the preferred stock under her will. The undeniable purpose and effect of this arrangement was to divert from her testamentary estate to the inter vivos trust the full economic benefit of her $1,260,000 investment during that period.
Along with her purpose to pass these benefits to her daughters and grandchildren outside of her testamentary estate, she had an equally clear purpose to keep the possession and enjoyment away from these beneficiaries so long as she lived. This purpose was manifested in an arrangement which made the result inevitable.
The common stock was placed in trust, thereby denying the beneficiaries even the possession of the share certificates. As the person who controlled the corporation, she saw that no dividends were paid on the common stock, and thus the trustee never possessed any cash which it could pay out to any beneficiary. Since both Mrs. Huntzinger and the trustee anticipated that condition, they agreed that she would pay the trustee's fees when the income was insufficient for that purpose.
Although the trustee had the power to sell the stock to a stranger, the conditions created by Mrs. Huntzinger made it most improbable that the trustee would do so. Such a sale, though lawful, would have frustrated the expressed intent of the decedent.[4] The trust instrument also relieves the trustee from liability for retaining this stock in the trust. *Page 577 
Under the terms of the trust it was also possible for the daughters to direct the trustee to distribute their trust shares to their respective issue. Such a distribution would have terminated the trust, but would not have resulted in the immediate enjoyment of any economic benefit by the distributees unless the stock were to be sold outside the family. The fact is that none of these possibilities took place, and for an obvious reason — the situation promised an enormous return to the beneficiaries if the stock was held, for during Mrs. Huntzinger's lifetime the medical center appreciated in value at no cost to the beneficiaries, and when she died they succeeded to the entire property at an enhanced value. Thus, by not disturbing Mrs. Huntzinger's plan, the trustee carried out her intentions and the beneficiaries were enriched. It was not until after Mrs. Huntzinger's death, and when control of the voting power passed from her to the beneficiaries and their trustee under the will, that the beneficiaries could open the receptacle and enjoy the benefits of ownership.
Madison is authority for the proposition that the unrealized possibility that the trustor's intent might have been defeated is not controlling. There, too, the trusts involved might have terminated before the trustor's death. The court said that the fact that the trustor had so provided "shows no more than that the trustor had alternative intentions. He made dispositions intended to take effect at his death, yet indicated his willingness that they be defeated under certain contingencies. It is irrelevant that his dispositions were subject to certain contingencies now that those contingencies can no longer occur. In fact, the trusts lasted until the trustor's death, and the trustor certainly intended that the transfer of what remained of the corpus should take effect in possession or enjoyment at his death." (26 Cal.2d at p. 462.) Accordingly, the interests involved in Madison were held to be subject to taxation. Similarly, in Thurston, supra, the court looked to events occurring after the initial transfer of the property involved, but before the death of the testator, to determine that there the property in question was not subject to an inheritance tax. ( 36 Cal. 2d at pp. 213-215.) *Page 578 
We therefore conclude that the appraiser properly included the value of the common shares in his computation of the inheritance tax. The order fixing the inheritance tax is reversed.
Jefferson, J., and Cole, J.,* concurred.
A petition for a rehearing was denied April 30, 1974, and respondent's petition for a hearing by the Supreme Court was denied June 13, 1974.
[1] Revenue and Taxation Code section 13643 reads: "A transfer conforming to Section 13641 and made with the intention that it take effect in possession or enjoyment at or after the death of the transferor is a transfer subject to this part."
[2] The last will and testament of Mrs. Huntzinger, which is in the record, was executed in 1968. No earlier will is in the record. However, her attorney's letter, written to her in 1957, indicates that the transfer of the preferred shares to her lineal descendants by will was a part of her estate plan. The declaration of trust (quoted in fn. 4, infra) declares her intent to keep the entire ownership of the medical center in the family "for so long as it is economically practical so to do."
[3] Section 2(3)(b) of the Inheritance Act of 1935, predecessor of Revenue and Taxation Code section 13643
[4] The trust agreement contains the following language: "The Thatcher Medical Center in Pasadena, California, was constructed by the Trustor in 1947 and 1948 in honor of her [Mrs. Huntzinger's] mother and father, Mahlon D. Thatcher and Luna A. Thatcher. Said property is the principal asset of the Huntzinger Investment Corp., the stock of which is an asset of this Trust. It is the wish and desire of the Trustor that said property and any and all adjacent property subsequently purchased by the Corporation and operated as a part and parcel of the Thatcher Medical Center, be held intact for the benefit of the members of Trustor's family for so long as it is economically practical so to do. It is the further wish and desire of the Trustor that any person exercising a power of appointment under the terms hereof, or any person having the right to exercise a power to withdraw assets from the Trusts, or the Trustee in making distribution of principal of the Trust Estate, respect the above expressed desires of the Trustor in so far as it is possible and practical so to do."
Similar language appears in the will of the decedent.
* Assigned by the Chairman of the Judicial Council. *Page 579